1
2
3                    UNITED STATES DISTRICT COURT
4                          DISTRICT OF NEVADA
5
6   MARCUS RONALD SWALLOW,
7                              Plaintiff,        Case No. 3:23-CV-00227-ART-CLB
8           v.
                                                 ORDER GRANTING SUMMARY
    MIGUEL PANTELAKIS, *et al.*,                 JUDGMENT
9
                             Defendants.
10
11
12          *Pro se* Plaintiff Marcus Swallow ("Mr. Swallow," or "Plaintiff"), an inmate in
13   the custody of the Nevada Department of Corrections ("NDOC"), brings this 42
14   U.S.C. § 1983 action against Wendover Police Department Officers Miguel
15   Pantelakis, Matthew Ulm, and Luis Perez (collectively referred to as
16   "Defendants"). Plaintiff claims that Defendants used excessive force in violation
17   of his Fourth Amendment rights when they fired upon him during the course of
18   an arrest. Defendants have brought a motion for summary judgment, arguing
19   that Plaintiff's claims are time-barred, that they did not violate his constitutional
20   rights, and that they are entitled to qualified immunity. (ECF No. 54). Plaintiff
21   has not filed a substantive response to Defendants' motion, although he
22   requested and was granted an extension of time to do so. (ECF No. 61).
23          The Court finds that while Plaintiff's claims are not time-barred,
24   Defendants are entitled to qualified immunity. The Court therefore grants
25   Defendants' motion for summary judgment.
26
27
28

                                        1

I.    **BACKGROUND**

A. **Factual Background**

The relevant facts in this case are undisputed unless indicated. This incident took place in Clearview Mobile Home Park, in West Wendover, Nevada in the early hours of the morning on March 12, 2020. While Mr. Swallow was visiting a residence that he describes as a "trap house," he smoked and injected methamphetamine. (ECF 54-3). Fifteen to thirty minutes later, Mr. Swallow left the residence. (*Id.*) He remotely started a Dodge Ram 1500 parked in the driveway, and got in. (*Id.*) The truck stood with a residence in front of it, and a cul-de-sac to its rear. (*Id.*) In the cul-de-sac, behind the driveway, were police officers on foot with their marked cars and their emergency lights on. (ECF No. 54). Mr. Swallow was unarmed and there were no arms in the truck. (ECF Nos. 7, 54).

Defendants state that they arrived on the scene after receiving a report that drugs were being delivered to that residence in a Chrysler 300 sedan. (ECF No. 54-2). Mr. Swallow slowly reversed the truck a few feet. (ECF No. 54-1). From behind the truck, the officers ordered Mr. Swallow to "stop your car." (*Id.*) Mr. Swallow stopped the truck and a passenger exited the vehicle. (*Id.*) Mr. Swallow did not. (*Id.*) The officers continued ordering Mr. Swallow to "get out of the car." (*Id.*) Mr. Swallow moved the truck forward a few feet, and the officers shouted, "stop the car" and "get out of the vehicle". (*Id.*)

Mr. Swallow revved the engine and began reversing out of the driveway. The video of the incident shows that when Mr. Swallow began to pass between two police cruisers, officers opened fire. (*Id.*) Defendants claim that Mr. Swallow reversed the truck "directly at the officers and their marked police vehicles." (ECF No. 54). Mr. Swallow testified in his deposition that he drove towards the source of the gunfire, and that bullets hit the sides and the back of the truck (ECF No. 54-3). The body cam footage shows officers somewhat off to the side of the path

2

of the reversing truck, diagonal to its direction of travel. (ECF No. 54-1). Mr. Swallow did not hit any officers or police cruisers. (*Id.*). The officers continued shooting for approximately eight seconds, and stopped after Mr. Swallow brought the truck to a stop on a lawn on the opposite side of the cul-d-sac. (*Id.*) They ordered him to "get out of the vehicle," "let me see your hands," and "show me your hands." (*Id.*) The engine of the truck started again, after which officers ordered "do not move" and "police, get down." (*Id.*)

After several moments, Mr. Swallow began driving away from the officers. (ECF No. 54-1). As he retreated down the street, the officers resumed shooting at him from behind, continuing their fire for a period of about four or five seconds. (*Id.*) Mr. Swallow crashed into a nearby home. (*Id.*) The officers then ran over and arrested him. (*Id.*) Although Defendants state in their motion for summary judgement that Mr. Swallow "was not struck by any of the rounds" and that his only injuries resulted from the crash, Mr. Swallow testified in his deposition that he had a mark on his arm from where a bullet grazed him. (ECF Nos. 54, 54-3).

**B. Procedural History**

On May 31, 2023, Plaintiff filed a complaint in this Court. (ECF No. 1) After screening his First Amended Complaint (ECF No. 7), the Court allowed Mr. Swallow to proceed on a claim of excessive force in violation of the Fourth Amendment against Officers Pantelakis, Ulm, and Perez. (ECF No. 8).

On September 17, 2024, Officers Pantelakis, Ulm, and Perez filed a motion for summary judgment. (ECF No. 54). Mr. Swallow timely moved for an extension of time to oppose Defendants' motion. (ECF No. 58). The Court later granted Mr. Swallow's motion, extending his opposition deadline to August 13, 2025, but he did not file a response. (ECF No. 61). As a result, Defendants' motion for summary judgment is unopposed.

## II.    LEGAL STANDARD

A "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in the nonmovant's favor. *See id.* at 255. Nevertheless, when a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And when the facts at issue are unambiguously captured in a video recording, courts view the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81.

"[A] motion for summary judgment may not be granted based on a failure to file an opposition to the motion ...." *Heinemann v. Satterberg*, 731 F.3d 914, 916 (9th Cir. 2013). Per the advisory committee notes to Rule 56, district courts are prohibited from granting "summary judgment 'by default even if there is a complete failure to respond to the motion.'" *Id.* at 917 (citing Fed. R. Civ. P. 56 Advisory Committee Notes (2010)). "If there is a failure to respond, the Rule 'authorizes the court to consider a fact as undisputed.'" *Id.* (quoting Fed. R. Civ. P. 56 Advisory Committee Notes (2010)).

A *pro se* litigant's motions and pleadings may be considered as evidence to meet the non-party's burden to the extent that: (1) the contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that the facts were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). Such

documents may be considered as evidence in opposition to summary judgement even where a *pro se* litigant did not respond with anything more than a motion to extend time. *See McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 324).

## III.  DISCUSSION

Defendants argue in their motion for summary judgment that Mr. Swallow's complaint is untimely. Although Mr. Swallow did not oppose the motion for summary judgement, he earlier argued that he is entitled to equitable tolling. (ECF No. 25). The Court deferred its decision. (ECF No. 32). Defendants further argue that they are entitled to qualified immunity.  (ECF No. 34). The Court addresses each of these defenses in turn.

### A. Statute of Limitations

Federal courts apply state statutes of limitations to § 1983 claims, *Lockett v. County of Los Angeles*, 977 F.3d 737, 740 (9th Cir. 2020), and Nevada's statute of limitations for claims such as Mr. Swallow's is two years. NRS 11.190(4)(e); see also *Rosales-Martinez v. Palmer*, 753 F.3d 890, 895 (9th Cir. 2014) ("in the absence of a federal provision for § 1983 actions, the analogous [Nevada] state statute of limitations for personal injury claims applies."); *Perez v. Seevers*, 869 F.2d 425 (9th Cir. 1989). Mr. Swallow's alleged injury occurred on March 12, 2020. Accounting for the fact that March 12, 2022 fell on a Saturday, NRS 11.190(4)(e) bars any claim brought on or after March 14, 2022. Fed. R. Civ. P. 6(a). Since Mr. Swallow filed his complaint with this court on May 30, 2023, his claim was 443 days late. It will only survive dismissal if tolling applies.

### 1. Administrative Tolling

Mr. Swallow is entitled to a period of administrative tolling due to Governor Steve Sisolak's Emergency Directive 009, as amended by Directive 026. *Monarch Casino and Resort v. Second Jud. Dist. Ct*, No. 89535, 2025 WL 2426704, at *1 (Nev. Aug. 21, 2025); *cf. Dignity Health v. Eighth Jud. Dist. Ct.* ex rel. *Cnty. of*

*Clark,* 550 P.3d 341, 343 (2024). Directive 009 was issued on April 1, 2020, in response to the Covid-19 pandemic. Emergency Directive 009 (Revised) (April 1, 2020). In Section 2, Governor Sisolak ordered that "[a]ny specific time limit set by state statute... for the commencement of any legal action is hereby tolled from the date of this Directive until 30 days from the date the state of emergency ... is terminated." *Id.* § 2. In the subsequent Directive 026, Governor Sisolak ordered that "[a]ll time tolled by Section 2 [of Directive 009] shall recommence effective July 31, 2020 at 11:59 pm." Emergency Directive 026 (June 29, 2020) § 5. The Directives therefore tolled the applicable state statute of limitations from April 1, 2020 to August 1, 2020, a period of 122 days. *Dignity Health*, 550 P.3d at 344.

### 2. Equitable Tolling

After accounting for the period of administrative tolling, Mr. Swallow's complaint is still late. The remaining 321 days of delay must still be tolled if his claim is to survive.

In the context of a § 1983 claim, federal courts apply the forum state's tolling doctrines. *See Hardin v. Straub,* 490 U.S. 536, 543–44 (1989); *Trimble v. City of Santa Rosa,* 49 F.3d 583, 585 (9th Cir. 1995). To equitably toll the statute of limitations in NRS 11.190(4)(e), plaintiffs must demonstrate that, despite their diligence, extraordinary circumstances beyond their control prevented them from filing within the limitations period. *Fausto v. Sanchez-Flores*, 482 P.3d 677, 681 (2021). The focus of equitable tolling is "whether there was *excusable delay* by the plaintiff." *Id.* (citing *City of N. Las Vegas v. State, Local Government Employee-Management Relations Board*, 261 P.3d 1071, 1077 (2011)) (emphasis in original). Where relevant to the context of the case, the Nevada Supreme Court also looks to nonexclusive factors such as the claimant's knowledge of the relevant facts, "the claimant's reliance on authoritative statements ... that misled the claimant about the nature of the claimant's rights", any deception or false assurances on the part of party against whom the claim is made, the prejudice to the defendant

6

1    that would actually result from delay during the time the limitations period is

2    tolled; and "any other equitable considerations appropriate in the particular

3    case." *Id.* (citing *Copeland v. Desert Inn Hotel,* 673 P.2d 490, 492 (1983)).

4         There are sufficient facts to show that extraordinary circumstances

5    prevented Mr. Swallow from gathering information needed to file his complaint.

6    Mr. Swallow spent the approximately sixteen-month period from March 12, 2020

7    to about June or July 2021 in the hospital and in Utah state prison. (ECF Nos.

8    25, 54-3). Upon his detention in prison, Mr. Swallow found that due to the

9    pandemic, the law library was closed, and that he did not have access to the

10   packet that he needed to file a civil rights complaint, which included the "M

11   populous"—possibly referring to an application to proceed *in forma pauperis.* (*Id.*)

12   *Cf. Asbury v. State*, 538 P.3d 445 (Nev. App. 2023) (where a prisoner claimed that

13   the prison law library contained the form he needed to file his habeas petition,

14   and that it was only open for one week before the statutory deadline, he may have

15   alleged facts sufficient to show that official interference made compliance with

16   the statutory deadline impracticable.) Nor did he have the address of the court

17   where he needed to file the complaint. (ECF No. 54-3). It was not until July 2021,

18   when Mr. Swallow was extradited to the Elko County Jail, that he had access to

19   a law library for the first time since his arrest. (*Id.*)

20        There are also sufficient facts in the record to show that despite the

21   extraordinary circumstances Mr. Swallow diligently pursued this action by

22   attempting to gather needed factual and legal information. While detained in Utah

23   for sixteen months without law library access, Mr. Swallow corresponded with

24   friends and his sister, and had hopes of reaching the police and the prosecution

25   through them. (*Id.*) After Mr. Swallow obtained the name and the contact

26   information of the prosecutor, he wrote multiple letters to him to try to get

27   necessary facts such as the names of the police officers involved in the shooting

28   but received no reply. (ECF No. 25.) During this same period, Mr. Swallow

1    attempted to reach the courts, but they were shut down due to Covid-19. (ECF

2    No. 54-3). Despite his efforts, Mr. Swallow lacked information on how to file a

3    civil rights complaint, where to file it, the names of the officers involved, the

4    address where the shooting and arrest took place, and the date. (*Id.*) It was not

5    until June or July 2021 that Mr. Swallow finally received the names of the officers

6    who shot at him and identified, with help from counsel, the location of the arrest.

7    (*Id.*) Mr. Swallow believed that if he filed before his criminal case concluded, his

8    civil rights case would be "stayed until the criminal case [was] completed." (ECF

9    No. 17.) The conclusion of his criminal case, he says, was delayed due to the

10   pandemic until February 2023, nearly three years after the incident. (*Id.*) Though

11   Mr. Swallow could have filed sooner, he diligently and promptly filed after his

12   state proceedings concluded, on May 30, 2023, while incarcerated in the

13   Northern Nevada Correctional Center. (ECF No. 1).

14          Viewing the record in the light most favorable to Mr. Swallow, the Court

15   finds that a reasonable jury could conclude that Mr. Swallow demonstrated

16   diligence in pursuing this action despite the extraordinary circumstances he

17   faced of hospitalization and imprisonment during the Covid-19 pandemic. Mr.

18   Swallow began attempting to prepare his claim during a period of pandemic

19   restrictions that were "unique" in recent world history and were especially severe

20   in prisons. *Diaz v. State*, 519 P.3d 505 (Nev. App. 2022) (quoting *United States v.*

21   *Olsen*, 995 F.3d 683, 693 (9th Cir. 2021)). Due to his hospitalization and the

22   pandemic, he lacked access to the law library and the forms needed to file a civil

23   rights complaint for a sixteenth month period. Defendants have not articulated a

24   particular prejudice that would result from allowing a late filing. At this stage in

25   the proceedings, the Court does not necessarily decide that Mr. Swallow has

26   shown that equitable tolling is warranted, but only that a reasonable jury could

27   find so under the most charitable version of the facts. Although he filed after the

28

1    limitations period, his claim is not time-barred for the purposes of summary

2    judgment.

3    **B. Qualified Immunity and Excessive Force**

4    In their motion for summary judgment, Defendants argue that they did not

5    violate Mr. Swallow's constitutional rights and are entitled to qualified immunity.

6    (ECF No. 54).

7    Qualified immunity is not merely an immunity from liability, but also an

8    immunity from suit. *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *Sinaloa Lake*

9    *Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1098–99 (9th Cir. 1995). The

10   doctrine of qualified immunity balances two important interests: "the need to hold

11   public officials accountable when they exercise power irresponsibly" against "the

12   need to shield officials from harassment, distraction, and liability when they

13   perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

14   The qualified immunity defense allows for mistaken judgments and protects "all

15   but the plainly incompetent or those who knowingly violate the law." *Id.* In so

16   doing, it protects public officials "'from undue interference with their duties and

17   from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510,

18   514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

19   The Supreme Court has set forth a two-part analysis for resolving

20   government officials' qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194,

21   201 (2001). Under the *Saucier* analysis, "[q]ualified immunity protects

22   government officials from liability under § 1983 unless (1) they violated a federal

23   statutory or constitutional right, and (2) the unlawfulness of their conduct was

24   clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th

25   Cir. 2024) (internal quotation marks and citations omitted). In the first step of

26   the process, the court considers whether the facts "[t]aken in the light most

27   favorable to the party asserting the injury . . . show [that] the [defendant's]

28   conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. In the second,

the court determines whether the right was clearly established at the time of the alleged violation. *Id.* A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229.

### 1. Plaintiff's Excessive Force Claim

Relying on their expert's testimony, the body-worn camera videos, and Mr. Swallow's deposition, Defendants contend that their use of lethal force was reasonable under the circumstances. Although Mr. Swallow did not oppose the motion, the court considers Mr. Swallow's previously-submitted evidence and the Defendants' evidence in the light most favorable to him as the non-moving party. *See McElyea,* 833 F.2d at 198; *Anderson*, 477 U.S. at 255.

### a. Standard

Courts examine the lawfulness of force used during an arrest under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386 (1989). "Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir.2001) (citing *Graham,* 490 U.S. at 397). Determining whether a particular use of force is reasonable requires a factfinder to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal quotation marks omitted). The "reasonableness" of a particular use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

In cases involving the use of deadly force, the Ninth Circuit applies a "more definitive rule": an officer may only use deadly force if they have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). A suspect may pose a threat of serious physical harm "if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, or if the suspect threatens the officer or others with a weapon capable of inflicting such harm." *Garner*, 471 U.S. at 11 (internal citation omitted). When it comes to the government's interest, courts generally examine factors such as, but not limited to: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396).

Use of lethal force is generally unreasonable when a suspect is in a slow-moving vehicle that presents officers with an avoidable risk of harm. For example, where the vehicle is moving so slowly that officers could easily step out of the way, the Fourth Amendment may protect the driver against the use of lethal force. *Villanueva v. California*, 986 F.3d 1158, 1170 (9th Cir. 2021) (citing *Orn*, 949 F.3d at 1174-75). Or, where a vehicle is moving away from an officer, and an officer fires into its side, that officer may lack an objectively reasonable basis for claiming that he did so out of fear for his own safety. *Id.* at 1175. Nevertheless, officers may reasonably consider themselves at risk of being struck by a stopped or slow-moving vehicle "when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle." *See Monzon v. City of Murrieta,* 978 F.3d 1150, 1161 (9th Cir. 2020); *Wilkinson v. Torres,* 610 F.3d 546 (9th Cir. 2010) (lethal force was reasonable where a person whose car

1    was stuck in the mud was attempting to accelerate out of the mud, and where an

2    officer reasonably feared that his colleague had already been struck); *Williams v.*

3    *City of Sparks*, 112 F.4th 635, 645 (9th Cir. 2024) (lethal force was reasonable

4    against a driver pinned between police cruisers and attempting to accelerate out

5    of the pin).

6                                    **b. The Record**

7            Turning to the record, several unknowns in the record preclude summary

8    judgment. While it is undisputed that officers used deadly force against Mr.

9    Swallow, the facts relevant to the government's interests in subduing him are

10   more complex.

11           First, some facts of the encounter are clear. Police encountered Mr. Swallow

12   as part of an investigation into the sale of drugs, a serious but not inherently

13   violent crime. (ECF No. 54-2). *See Graham*, 490 U.S. at 396. Mr. Swallow,

14   emerging from a house, got into a truck that was parked in a driveway. Before he

15   began driving, police and police cruisers were arrayed behind him, and a fence

16   and a residence were in front. Mr. Swallow revved his engine and moved the truck

17   forward and back a few feet. Mr. Swallow did not lead the police on a high-speed

18   chase, and his truck was not stuck and threatening to break free in a sudden

19   and unpredictable burst of speed. *Cf. Williams*, 112 F.4th. He reversed out of the

20   driveway with officers on foot generally to his rear. Mr. Swallow stopped on

21   someone's lawn, turned, and drove away from the officers. As he was driving

22   away, officers resumed firing and continued for about four or five seconds. (ECF

23   No. 54-1). While Defendants do not address the second volley of shots in their

24   motion for summary judgment, and indeed suggest that it never happened, (ECF

25   No. 54) a reasonable jury would have to find that the video evidence shows that

26   they fired at Mr. Swallow from the rear while he retreated. Regardless of whether

27   he knew he was fleeing police or not, Mr. Swallow did flee, and his flight ended

28   when he crashed into a house. (ECF No. 54-1). *See Graham*, 490 U.S. at 396.

                                        12

Next, some crucial facts are either in dispute or otherwise unclear. The gaps are particularly relevant to evaluating whether Mr. Swallow "posed an immediate threat to the safety of the officers or others." *Id.* Neither party claims to know Mr. Swallow's precise speed or acceleration, which has been important in similar decisions. *Contrast Villanueva*, 986 F.3d at 1170 (denying qualified immunity for officers who shot a driver who was moving at 5 miles per hour or slower) *with Monzon,* 978 F.3d at 1161 (granting qualified immunity to officers who shot a driver who accelerated from a standstill to 17.4 miles per hour in fewer than five seconds). Defendant's expert says that the truck was "rapidly accelerating" towards the officers. (ECF No. 54-2). In contrast, the body-worn camera video shows that Mr. Swallow was moving at a low speed when the officers opened fire. It is not clear when he began accelerating or exactly how much, although after the officers opened fire, he started moving at a higher rate of speed. *Cf. Monzon*, 966 F.3d at 950 (noting that the decedent pushed the accelerator pedal "from 84 to 99 percent" while facing towards officers).

No evidence purports to give a full accounting of where officers stood relative to Mr. Swallow's truck or how close they were to being hit. *See Orn*, 949 F.3d at 1175; *Monzon,* 978 F.3d at 1157 (finding relevant the number of feet away the moving vehicle was from officers, which individual officers were in the path of travel, and when). The video footage of Mr. Swallow reversing the truck does not show officers directly in his path of travel. (ECF No. 54-1). Officers are seen firing upon Mr. Swallow from diagonally behind him as he reverses. (ECF No. 54-1). In his deposition, Mr. Swallow acknowledged that bullets came in through the rear and side of the truck, and that he reversed roughly "towards" the direction of gunfire. (ECF No. 54-3). Mr. Swallow testified that he did not intend to hit the officers, but rather wished to exit the driveway. (*Id.*) He claimed that he did not know that there were officers behind him at all, that while he was parked he could not hear the officers' orders over the loud sound of the truck's engine and the

13

1    radio playing at a high volume, and that when his passenger exited the truck she
2    did not tell him that police were there. (*Id.*) Mr. Swallow acknowledged that he
3    was high on methamphetamine at the time and testified that while high he does
4    not "feel reality." (*Id.*) When the police began shooting, Mr. Swallow claims that
5    he thought they intended to rob him, and did not realize that they were police
6    officers until they arrested him. (*Id.*) Such testimony, if believed, would make it
7    less likely that Mr. Swallow intended to hit the officers and incapacitate them in
8    order to flee. In contrast, Defendants' expert opines that "officers behind Mr.
9    Swallow's truck were not in positions of cover that could shield them from the
10   truck that was rapidly accelerating towards them. As such, an officer would
11   recognize that any delay in addressing the threat could result in great bodily
12   harm or death to the officers and any innocent people in the area." (ECF No. 54-
13   2).

14         There is almost no admissible information in the record about what
15   individual officers perceived. Although the two body-worn camera videos can
16   fairly be assumed to represent the point of view of two officers, it is not clear
17   whose camera is whose. The third defendant's perspective is unknown.

18         Taking the record in the light most favorable to the non-movant, a
19   reasonable jury might not necessarily find in officers' favor. Defendants' expert's
20   testimony and the video footage do not completely align. A jury could infer from
21   the video that no officers were directly in Mr. Swallow's path of travel, and that
22   he maneuvered around officers and their vehicles. Mr. Swallow's speed is not in
23   evidence, although the video suggests that it was not high when officers opened
24   fire. A jury would take this together with the facts that are clearly established,
25   such as the fact that Mr. Swallow was not under investigation for a violent crime,
26   but rather merely exiting a house that was under investigation for possible drug
27   offenses. Defendants have not established that they did not violate Mr. Swallow's
28   Fourth Amendment rights.

**c. Declining to Reach a Constitutional Question**

When so many key facts remain unknown, courts are not always required to rigidly execute the two-step analysis of *Saucier*. 533 U.S at 201. Normally, the two prongs of the qualified immunity analysis are (1) whether officers violated a constitutionally protected right, and (2) whether the right in question was clearly established at the time when the incident took place. *Id.* But where the second prong alone is enough to determine the outcome, courts may skip the first. *See Pearson*, 555 U.S. at 239. This may be done in "circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking," such as when "the briefing of constitutional questions is woefully inadequate." *Evans v. Skolnik*, 997 F.3d 1060, 1065 (9th Cir. 2021) (citing *id.*). Furthermore, "although the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development," particularly where the constitutional question is "so factbound that the decision provides little guidance for future cases." *Id.* (*citing Pearson,* 555 U.S. at 237).

This case is just the kind in which avoiding the constitutional question is appropriate. The briefing is 'inadequate" to render a decision on a constitutional question, as the nonmovant has not made a response, and the movants have not had an opportunity to give a substantive reply. Without more information about what individual officers could see and hear, it is not proper to leap to a conclusion about whether their uses of lethal force were reasonable. *Mondragon v. City of Fremont*, 854 F. App'x 197, 198 (9th Cir. 2021) (in a motion for summary judgement based on qualified immunity, officers' actions must be analyzed individually); *cf. Lopez v. City of Mesa*, No. CV-19-04764-PHX-DLR, 2022 WL 363994, at *3 (D. Ariz. Feb. 3, 2022), aff'd, No. 22-15278, 2024 WL 3250380 (9th Cir. July 1, 2024) (denying qualified immunity in part because a reasonable jury could determine that an officer did not perceive sufficient facts to support his

15

purported belief that his colleague had been hit by a car, and was at risk of being hit again). Fourth Amendment law involving the rights of suspects fleeing in motor vehicles at low speed is fact-bound, turning on holistic assessments of factors such as speed, direction, location relative to officers and members of the public, and likely imminent movements. Not only are many of those facts unknown here, but even if they were, any decision on the Fourth Amendment issue would be difficult to extend to future fact patterns. *See Brosseau v. Haugen,* 543 U.S. 194, 201 (2004). Finally, the constitutional question is not necessary to the decision, as the officers ultimately prevail under the qualified immunity analysis.

### 2. Whether the Right was Clearly Established

Qualified immunity shields officers from suit even when they violate the Constitution, so long as the constitutional right in question was not clearly established at the time of their acts. *Saucier,* 533 U.S. at 206. "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau*, 543 U.S. at 198)). Cases "cast at a high level of generality" are unlikely to establish rights with the requisite specificity, except in the rare "obvious case." *Brosseau*, 543 U.S. at 199; *District of Colombia v. Wesby*, 583 U.S. 48, 64 (2018). A clearly established right usually requires "controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 63 (internal quotation marks omitted) (quoting *Ashcroft*, 563 U.S. at 741–42).

1    It is the plaintiff's burden to show that a right is clearly established. *See Hopson*
2    *v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023).

3        Mr. Swallow has not met his burden to show that Defendants are not
4    entitled to qualified immunity. Precedent does not establish that officers violated
5    a clearly established right.[1]

6        By March 12, 2020, the date of the shooting, the Ninth Circuit had decided
7    two cases presenting comparable facts to this case. In these two cases, officers
8    violated the Fourth Amendment where they shot a slow-moving driver from the
9    side or the back of the vehicle. *Orn*, 949 F.3d; *Acosta v. City & Cnty. of San*
10    *Francisco*, 83 F.3d 1143, 1144 (9th Cir. 1996), as amended (June 18, 1996). In
11    *Orn*, the Ninth Circuit held a reasonable jury could conclude that an officer
12    violated the Fourth Amendment where he shot a driver through the passenger-
13    side window of a vehicle moving away from him. 949 F.3d at 1175, 1177. The
14    incident in *Orn* began with a low-speed chase, during which the driver avoided a
15    police cruiser blockade without injuring or attempting to injure any officers. *Id.*
16    at 1172. When a police officer attempted to block the driver's path with a cruiser
17    for a second time, the driver came to a brief stop, then attempted to drive up on
18    a strip of grass to maneuver around the police. *Id.* His speed was an estimated 5
19    miles per hour when police shot him. *Id.* at 1173.

20        It is less clear in Mr. Swallow's case than in *Orn* that officers were not at
21    any serious risk. Even taking the evidence in the light most favorable to Mr.
22    Swallow, his speed is unknown, and the possibility that he was driving at more
23    than 5 miles per hour or significantly accelerating cannot be ruled out. (ECF No.
24    54-1). Neither is it exactly true in this case that all three officers were directly to

25    _____

26    [1] Although Defendants invoke *Williams*, that case was decided in 2024 and
    evaluates whether official actions taken in May 2020 violated a clearly established
27    right. *Williams v. City of Sparks*, 112 F.4th 635, 645 (9th Cir. 2024) As such, it
    does not weigh on whether or not Defendants should receive qualified immunity
28    for their actions in March 2020. *See Brosseau*, 543 U.S. at 200 n.4.

the "side" of the truck or that the truck was moving away from them. *Orn*, 949 F.3d. at 1178. While the officers' locations are not in evidence, Mr. Swallow testified in his deposition that gunshots came in through the rear and sides of the truck as he reversed. (ECF No. 54-3). It appears from the video that the officers may have been diagonal to Mr. Swallow's path, and that Mr. Swallow continued getting closer to at least some of them as they fired and he drove on.[2] (ECF No. 54-1). Furthermore, given what they knew at the moment of the shooting, officers may have been less unreasonable here to fear erratic and dangerous acceleration and changes in direction than in *Orn. See Graham,* 490 U.S. at 396 (use of force must be evaluated from the perspective of a reasonable officer at the scene, not with the benefit of hindsight). The driver in *Orn* had been attempting to evade officers at low speed for a period of time, *Id.* at 1172, while Mr. Swallow began driving from more or less a standstill. (*Id.*) Police in *Orn* had previously watched the driver maneuver around a blockade without hitting anyone, *Id.,* while in Mr. Swallow's case, the shooting occurred at the beginning of the encounter, before officers had an opportunity to learn how he was likely to behave. (*Id.*) While the driver in *Orn* had already driven up on a grassy strip specifically to avoid hitting police vehicles, 949 F.3d. at 1172, Mr. Swallow started revving the engine and accelerated the truck from a standstill out in the general direction of the officers on foot, giving a less clear indication of his intent and where he was going to drive next. (*Id.*)

---

[2] Even though officers fired upon Mr. Swallow from the rear when they shot at him for the second time, their position relative to Mr. Swallow at that moment is not as critical to the analysis as their position when they first began shooting. The purpose of evaluating whether officers were at risk of being hit or not is to evaluate the reasonableness of the officers' evaluation that Mr. Swallow posed a threat to them or to the public, and if Mr. Swallow posed a threat to officers when he reversed in their direction, then it may have been reasonable for officers to believe he still posed a threat to the public when he fled them and crashed into a house.

18

1    In *Acosta*, an officer was held to have violated the Fourth Amendment when

2    he shot a suspect through the side of a slowly moving vehicle. *Acosta,* 83 F.3d.

3    The officer had chased two men on foot on suspicion of stealing a purse, and

4    when the two men got into a car, the officer shot and killed the driver. *Id.* Expert

5    and lay testimony established that the officer was off to the side of the car, which

6    was "moving or rolling slowly," and that he could have avoided injury by simply

7    stepping to the side. *Id.* at 1146-48.

8    Mr. Swallow's conduct may have differed from *Acosta* in the critical matters

9    of "the speed at which the vehicle was traveling and the officer's ability to avoid

10    the oncoming vehicle" *Id.* at 1147 n. 9. From the video, it does not seem that a

11    reasonable jury could describe him as merely "rolling," *Id.* at 1147, a word which

12    suggests negligible intentional acceleration. (ECF No. 54-1). If any officers were

13    in Mr. Swallow's path, it is possible that they could not simply step to the side to

14    avoid injury. (*Id.*) Mr. Swallow may also have also been closer to driving towards

15    officers than the driver in *Acosta*, as the evidence shows that officers were not

16    fully off to the side of the truck as he reversed. (*Id.*)

17    Because the law did not "squarely govern" the Defendants' conduct at the

18    time of the shooting, they are entitled to qualified immunity. *Brosseau,* 543 U.S.

19    at 201. Although the officers have not shown that their actions were

20    constitutional, there are differences between this case and precedents that have

21    found a Fourth Amendment violation. To be clear, the record does not show that

22    these officers were presented with the indicia of danger found in cases such as

23    *Wilkinson*, 610 F.3d at 551 (where a fleeing suspect had led officers on a chase,

24    and one officer believed that the other one had already been hit by the suspect's

25    minivan and was likely to be hit again, use of lethal force was reasonable).

26    Nevertheless, for purposes of qualified immunity, the dispositive point is that *Orn*

27    and *Acosta* may reasonably be interpreted not to control Mr. Swallow's case.

28    Officers would not have been wholly unreasonable to believe that their behavior

was lawful. Taken together, precedents governing at the time suggest "that [the officers'] actions fell in the 'hazy border between excessive and acceptable force.'" *Id.*

### IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (ECF No. 54).

Defendants are dismissed from this case.

The Clerk of Court is directed to close this case and enter judgment accordingly.

DATED: September 29, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE